## Supreme Tribe of Ben Hur v. Emma Miller.

1. FRATERNAL BENEFIT SOCIETY—*when by-law as to suspension of member does not apply.*  Where the by-laws of a society provide that a member who takes his own life becomes *ipso facto* suspended from membership, another by-law providing that no suspension shall be upon mere rumor without investigation or trial, has no application.

2. REHEARING—*what cannot be urged upon application for.*  A party cannot upon an application for a rehearing rely upon grounds for reversal not brought to the attention of the court in his brief and argument filed upon the original hearing.

Action of assumpsit.  Appeal from the Circuit Court of Champaign County; the Hon. SOLON PHILBRICK, Judge, presiding.  Heard in this court at the May term, 1905.  Reversed, with finding of facts.  Opinion filed October 9, 1905.  Rehearing denied November 28, 1905.

JOHN J. REA, for appellant.

F. M. GREEN & SON, for appellee; GEORGE W. GERE, of counsel.

MR. PRESIDING JUSTICE PUTERBAUGH delivered the opinion of the court.

This is an action in assumpsit, brought by appellee against appellant, a fraternal insurance order, to recover the sum of $1,200, alleged to be due her by the terms of a beneficiary certificate issued by appellant to one Alexander R. Weber, who became a member of Caledonia Court No. 20, a subordinate lodge of said order, located at Urbana, Illinois, on December 2, 1901, and who died on March 15, 1904. A trial by jury resulted in a verdict for appellee, upon which judgment was rendered for $1,200.

The declaration avers, in substance, the issuance of the certificate to Weber, under which appellee, his aunt, was designated as beneficiary; that assured was at the time of his death a member in good standing of said order; his death on March 15, 1904, and compliance by the insured, and appellee as beneficiary, with all the requirements and conditions of such certificate and the laws and regulations of the order.  To the declaration appellant inter-

posed the general issue and two special pleas, the first of which avers that at the time the certificate was issued and ever since, there was in full force and effect the following law, rule and regulation of said society, viz.: "If a member, sane or insane, voluntarily or involuntarily, attemps to commit suicide, such member shall *ipso facto* void all rights under his beneficial certificate and stand suspended from the order and shall not be eligible for reinstatement or membership thereafter;" that said Weber, on February 11, 1904, voluntarily attempted to commit suicide by shooting, at Bloomington, Illinois; that because of such attempted suicide said Weber forfeited all his rights under said certificate, and was, by said act, suspended from said order and was not at the time of his death a member of the same. By the second special plea it is averred that Weber obtained said certificate by making false statements and answers in his application for said membership and certificate, which he had therein warranted to be full, true and complete, and by fraudulently concealing material matters and things that he should have therein disclosed.

In reply to the first special plea it is averred by appellee that Weber did not attempt to commit suicide; and further that prior to the date of the alleged attempt Weber had paid all assessments under said certificate, and that after said date, the appellant society, with knowledge of said attempt, by its officers and agents, received and accepted from appellee the monthly dues and assessments for the months of February and March, 1904, by reason of which it waived all right to insist upon a forfeiture by reason of such violation of the rules of the order. Upon the question of the attempted suicide John H. Pike, who on February 11, 1904, occupied the room adjoining that occupied by Weber, testified substantially as follows:

"Weber's room was next to mine; he came into my room while I was shaving. He took his arm and pushed me to one side and pulled the dresser drawer out and looked in and closed it, and went and sat down on the bed. I said, 'What are you looking for, Alex.?' He made no reply.

He sat there a little while and said, 'I don't know what in the hell to do.' I said, 'What is the matter with you?' He said, 'Nothing.' I said, 'I guess there is something the matter with you.' 'Well,' he said, 'I got into it.' I said, 'I told you a long time ago to keep your mouth shut and attend to your own business.' We talked on for a little while and I finished shaving, left the light burning and went down into the bath room. Just after I got there they called me. The shooting took place in my room. I did not hear the shots. I had been out of my room only about two minutes when my attention was called to the commotion upstairs. I was the first man in that room. I went into the room and struck a match and lighted the lamp. He had blown out the light. I struck a match and looked around, and saw him lying on the bed. He had nothing in his hands. I went to him and said, 'Weber, what in the hell have you done?' He said, 'I shot myself.' I said, 'What for?' He said, 'Damned if I know. I wish I had made a good job of it.' His clothes were afire. I tore his vest open and put the fire out. We turned him on his right side and back, pulled his clothes up and felt along to see the course of the wound. The wound was on the left side just at the lower rib probably three inches below the nipple. The size of the ball was No. 38. Had no further conversation with him. I visited him at the hospital. Had conversation with him there but once, but did not have a talk with him how he came by his wound. He was confined to his bed at that time. He simply said he shot himself. I do not know how he came to shoot himself. Saw the revolver after the shooting. It was lying under the dresser by the end of my trunk or about eight or ten feet from the bed."

Carl Craig testified, in substance, as follows: "I knew Alex Weber in his lifetime. He boarded at my mother's. I stayed there also. I did not hear any gun shot report. When I got into the room Weber was lying on the bed. He was fully dressed, with one foot touching the floor, the other hanging just over the edge of the bed. He had his

hand to his side. ⸱ We examined him and found that a bullet had entered his body there. We found a revolver under the edge of the dresser. The bed was in one corner of the room and the dresser in the other corner, about ten feet from the bed. This was just after supper, between 6:30 and 7 o'clock. When I asked him what he had done with the revolver, I could not tell definitely what he said. My best recollection is that he said he threw it. He did not point or indicate where he had thrown it. They conveyed him to a hospital. Have given all the conversation had with Weber while he was lying on the bed in that room at mother's residence. Mr. Pike was there. He was talking with Weber in the room. Weber said he wished he had done a good job. Do not know what Pike said to him prior to that. I asked him if he had shot himself. He said he did. I asked him why he did it, but he made no answer. There was not a word said in these conversations with regard to the shooting being an accident. Did not hear the question of accident talked of. They did not ask whether it was an accident, whether somebody was the cause of it, or whether it was anybody's else negligence or anything of that kind."

From the foregoing testimony, which is practically uncontradicted, no other inference or conclusion can be reasonably drawn than that on the occasion in question Weber voluntarily attempted to take his own life, thus violating the rule or by-law set out in the first special plea; the effect of which act was *ipso facto* to suspend him from membership in the order and to render the beneficiary certificate void. The contention of appellee that Weber could not be suspended from the order upon a mere rumor that he had attempted suicide, without a trial or investigation, under section 103 of the by-laws, is without force. The section referred to, which provides merely that when it is charged or has come to the knowledge of the Supreme Tribe that a beneficial certificate has been obtained by false representations or concealments of any material fact, notice shall be given to the member and a hearing or inquiry had upon such charge, is wholly inapplicable.

Upon the question of the alleged waiver because of the alleged acceptance by the local scribe of assessments falling due thereafter, the evidence discloses that on February 20, 1904, appellee furnished, and by the hand of her granddaughter, sent to Johnson, the local scribe of Caledonia Court, the sum of one dollar, being the assessment for the month of February, 1904, which by the terms of the certificate and rules of the order became due on the first day of that month; that Johnson accepted the money and forwarded it to the home office of the society at Crawfordsville, Indiana; that after the death of Weber, Mrs. Gere, a daughter of appellee, accompanied by an attorney, called upon Johnson and tendered the assessment for the month of March, 1904; that Johnson at first refused to accept the same and offered to refund to appellee the sum theretofore paid for the February assessment, stating that the Supreme Lodge had declined to accept the same, and further that there was no use in his receiving the March dues; that the home office would accept no more money; that Mrs. Gere insisted that Johnson should accept the money and give her a receipt therefor, and that he, Johnson, finally received and receipted for the March assessment under protest. Johnson testified that prior to the time he received the February assessment he had heard that Weber had attempted to commit suicide on February 20, 1904, but it does not appear that he had any positive or direct information upon the subject.

We are of opinion that the facts detailed were insufficient to establish the truth of the replication to the first special plea; that the acts of Johnson did not constitute a waiver of appellant's right to interpose the violation of the rule against attempted suicide, as a defense to appellee's claim under the certificate. The February assessment was due on February 1st, and appellant was entitled to receive the same regardless of anything that may have occurred subsequent to that date. While the March assessment was finally received by him and a receipt given therefor, the uncontradicted evidence of Johnson shows that appellee's

daughter, Mrs. Gere, was at the time expressly informed that such payment would be unavailing, for the reason that the Supreme Lodge would not accept the money. Conceding that the subordinate lodge was the agent of appellant and that it and its officers had the power to waive any provisions of the by-laws and certificate, the failure of the scribe, under the circumstances, to refuse absolutely to receive the money, was clearly not a waiver of such provision within the rule laid down in the cases cited by counsel for appellee.

It follows that appellee failed to establish her right of action. Consequently the judgment must be reversed without remanding the cause.

*Reversed.*

Finding of facts, to be incorporated in the judgment of the court:

We find that on the 11th day of February, 1904, at Bloomington, Illinois, the assured, Weber, voluntarily attempted to commit suicide by shooting, and that no assessments falling due under the terms of the certificate of insurance and by-laws were accepted by appellant after that date.

PER CURIAM. It is contended in the petition for rehearing filed by appellee in this case, that in any event she is entitled to recover one-tenth of the amount of the certificate held by the deceased at the date of his death, under the terms of the contract of insurance which provides: "If a member commit suicide after two years and within three years from date of his beneficial certificate, the amount payable to his beneficiary shall be one-tenth of the amount of the certificate held by him at the date of his suicide."

There are several answers to this contention: first, in the trial in the Circuit Court appellee for the purpose of securing a verdict and judgment for the full amount of the certificate took the position that the insured did not commit suicide; second, in her brief and argument on appeal in this court appellee renewed her insistence in the trial court and made no claim that she was entitled to recover anything by virtue of the provision above quoted, but rested her right

of recovery solely upon the grounds disposed of in the opinion filed; third, it does not appear from the evidence in the record that the death of the insured resulted from the self-inflicted wound, in other words, that the insured committed suicide.

A party upon appeal to this court cannot assume a position inconsistent with that assumed in the trial court; neither can he, on petition for rehearing, rely upon a right of recovery not claimed or brought to the attention of the court, in his brief and argument filed in the cause. The petition for rehearing is denied.